**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------

STICHTING JURIDISCH EIGENDOM DE VESTE
BELEGGINGSFONDSEN,

                     Plaintiff,

      -against-

CAPSTONE CREDIT, LLC, CAPSTONE CAPITAL
GROUP, LLC and JOSEPH F. INGRASSIA,

                  Defendants.

-------------------------------------------------------------------

CAPSTONE CREDIT, LLC and CAPSTONE
CAPITAL GROUP, LLC,

              Counterclaim-Plaintiffs,

      -against-

STICHTING JURIDISCH EIGENDOM DE VESTE
BELEGGINGSFONDSEN, JACK VAN
OOSTERBOSCH, AND DE VESTE B.V.,

             Counterclaim-Defendants.

-------------------------------------------------------------------

Case No. 21-cv-2102-LGS-SN

### AFFIDAVIT OF JOSEPH F. INGRASSIA
### IN OPPOSITION TO MOTIONS

JOSEPH F. INGRASSIA, being duly sworn, deposes and says:

1.    I am the Managing Member of Capstone Credit, LLC, and Capstone Capital

Group, LLC (together the "Capstone Entities"), both Delaware limited liability companies that

have been named as defendants in the above-captioned proceeding.  I have been named as an

individual defendant in the same proceeding.  I make this affidavit in opposition to the motions

made by Plaintiff-Counterclaim Defendant Stichting Juridisch Eigendom De Veste

Beleggingsfondsen ("Stichting") and by Counterclaim Defendants De Veste B.V. ("De Veste")

and Jack van Oosterbosch.  I am familiar with the information set forth in this affidavit either from personal knowledge or on the basis of documents I have reviewed.

2.      The Capstone Entities, established in 2009, specialize in providing dependable financing for construction, manufacturing, publishing, temporary staffing, sales, advertising and public relations through factoring and purchase order financing.  Beginning in 2009, the fund that Plaintiff, De Veste and Jack van Oosterbosch operated invested as a limited partner in the Capstone Cayman Current Liquidity Fund, LP ("CCCLF"), a Cayman Islands limited partnership.  CCCLF was formed primarily to make senior subordinated debt loans to the Capstone Entities.

3.      Since 2009, Jack van Oosterbosch has been the principal, and often the only, means available to Defendants of communicating with Plaintiff, De Veste and their predecessors in interest.  I first met Jack in 2009, when he was considering investment by De Veste in CCCLF.  As part of his due diligence, he and his team visited the offices of the Capstone Entities.  After that first visit, he visited the Capstone offices in New York City once or twice a year, attended events with me in the New York City area, including New York Jets football games, and sent investors to meet with me and my staff to become better acquainted with the Capstone Entities and with me.  At his invitation, I attended investor conferences in The Netherlands and met his family, including his son, Esgher.

4.      Several years after the parties began this business relationship, I learned from Jack that changes in the regulatory framework governing the operations of the funds that they operated required changes in the way Stichting and De Veste invested in CCCLF.  These changes are described in his Declaration (Van Oosterbosch Declaration at ¶¶ 8-11) in more detail than I recall, but the description there of what it meant for his investment in CCCLF matches up

with my recollection.  I also learned from Jack that The Netherlands Authority for the Financial Markets ("AFM") was raising questions about De Veste's operations.  He asked for our assistance in responding to the questions that AFM raised; we promptly provided whatever assistance we could.  In some instances we could not provide the requested information as it would have required us to back date information and documentation which we refused to do, as Capstone Chief Financial Officer Ruth Abady-Soltanovici testified at her deposition.  See Chin Declaration, Exhibit 4 (Abady Tr. 209:7-213:12).

5.     To address issues with the AFM, we understood from Jack that it was necessary to change the way De Veste invested in CCCLF, as Jack indicates in his Declaration.  Van Oosterbosch Declaration at ¶ 11.  Ultimately, we agreed to change the investment by De Veste as a limited partner to a credit line.  This enabled his fund investors (who were retail investors with less than $100,000 to invest and forbidden by law to invest in a fund like CCCLF) to continue their investment in CCCLF, while a new company run by his son Esgher (De Nieuwe Veste) continued as a limited partner through a fund with institutional investors (investors with at least $100,000 to invest).  I assisted Jack and his son as this conversion took place.  Attached as Exhibit 1 to this affidavit is one of the many emails exchanged.  (CAPSTONE 0002577-CAPSTONE 0002579).  I am also attaching as Exhibit 2 a copy of the first few pages of the Confidential Private Placement Memorandum of CCCLF dated May 2017, which has not changed substantially since the fund's inception and clearly notes investment limits (CAPSTONE 0001299-CAPSTONE 0001306).

6.     Accordingly, on or about September 25, 2017, Plaintiff entered into a Loan and Security Agreement with Capstone Credit, and a separate Loan and Security Agreement with Capstone Capital (collectively the "LSAs").  The Capstone Entities signed two Line of Credit

Notes and Plaintiff also entered into an Intercreditor Agreement with CCCLF. Jack signed the LSAs, the Line of Credit Notes and the Intercreditor Agreement ("Loan Documents") as "Read and agreed to." Copies of the Loan Documents are attached to the Tick Declaration as Exhibits 1-5.

7.      The real purpose of executing the Loan Documents was not for Plaintiff to extend a loan, but to allow Jack, De Veste and Plaintiff to stay invested in CCCLF while addressing problems with their regulators in The Netherlands. Subsequent to the parties' execution of the Loan Documents, Jack again suggested restructuring the arrangement, but this never occurred. We accommodated his requests whenever feasible in light of the longstanding relationship between myself, the Capstone Entities and Jack, Plaintiff and De Veste and their predecessors in interest. Unfortunately, despite all our efforts, AFM revoked De Veste's license in December 2019.

8.      After execution of the Loan Documents, the business relationship that had developed since 2009 did not change substantially. Jack continued to treat CCCLF, the Capstone Entities and me much as a partner in investment endeavors, joining in investor updates and emailing and calling me frequently about every aspect of the Capstone Entities' business. Throughout the parties' relationship, the Capstone Entities held weekly calls, during which reports were made to Plaintiff, De Veste and Jack on the Capstone Entities' financial position, including their cash position and the makeup of the Capstone Entities' portfolio. In addition, the Capstone Entities issued weekly written reports, known as Tuesday Reports, and provided a data room of information on all funded transactions in the portfolio. As was the case when Stichting/De Veste was a limited partner in CCCLF, it was not unusual for De Veste to make and then withdraw a redemption request, and the parties typically discussed the requests before and

after De Veste made them.  Indeed, prior and subsequent to the Loan Documents' execution, De Veste often submitted redemption requests far in advance of any payment date, and often cancelled them.  Jack mentioned his redemption requests as standard practice at his deposition. See Exhibit 2 to Chin Declaration (Oosterbosch Tr. 110:2-111:13).

9.      The pandemic had a devastating impact on the Capstone Entities and our clients. In early 2020, I discussed the situation with Jack and made it clear that it would not be possible to honor redemption requests until conditions improved.  Nevertheless, in March and April 2020, Plaintiff demanded pre-payment of ten percent of the outstanding principal under the Loan Documents.  Jack was well aware that the Capstone Entities did not have the cash position to honor such a request.

10.     Defendants were unable to honor the redemption requests for March 2020 and April 2020.  Consequently, in June 2020, Plaintiff declared default and accelerated the balance due under the Loan Documents.  Even after this, the parties continued business as usual, holding weekly meetings to discuss the Capstone Entities' financial position, providing and reviewing mid-term financials, and discussing alternative solutions to resolve the redemption issue, such as refinancing the loans and seeking another investor to take over the loans.  We fully cooperated in yet another effort to assist Jack in November 2020, when he asked for our cooperation with The Development Group to perform a valuation of the portfolio.  To that end, I met with the Managing Partner of The Development Group in White Plains, New York, on November 18, 2020.

11.     On December 3, 2020, Jack and I discussed by telephone waiving the alleged default and amending the Line of Credit Notes to reflect interest payable through October 2020 and payments to reduce principal thereafter until paid in full, addressing any interest accrued

during the wind-down period once the final principal payment was made.  On December 7, 2020, we clarified over email the payments to be made, and I advised him that Capstone in-house counsel had been asked to prepare the amendment.  Attached as Exhibit 3 is a copy of the email exchange (CAPSTONE 0002658-CAPSTONE 0002659).

12.     On January 15, 2021, I confirmed to Jack that we would present a modification to the LSAs memorializing our verbal agreement that payments after the August and September interest payments would be applied to principal until the note was paid in full as part of a long email responding to another inquiry from Jack apparently generated by questions from AFM.  A copy of this email is annexed as Exhibit 4 (ST CAP 002534-ST CAP 002535), redacted to show the relevant language.

13.     Throughout this period, Jack represented repeatedly that after the Capstone Entities wired an initial payment, Plaintiff would execute the modification documents.  At no time prior to transmittal of the wire and the modification documents did he reveal that he lacked authority to negotiate the modification we had been discussing for months.  I understood that he was negotiating on behalf of Plaintiff and De Veste, and keeping Plaintiff and De Veste apprised of such negotiations.  Based on our long relationship, I had every reason to believe that the modification was a valid and binding agreement.

14.     The modification documents as drafted are included in Exhibit 8 to the van Oosterbosch Declaration.  The documents provided that once the Capstone Entities made outstanding interest payments in the amount of $457,270.70 and $372,893.83, Plaintiff would waive the so-called Event of Default, and any payments over the outstanding interest amount would be applied to the principal of the Notes.  On February 26, 2021, relying on Jack's representations, the Capstone Entities wired $1 million to Plaintiff.  On February 28, 2021, I

emailed the modification documents executed by the Capstone Entities to Jack. In the email, I included an updated account statement reflecting the February 26 wire, and requested that Jack have his administrator sign and return a copy for Defendants' files. Those emails are also included as Exhibit 8 to the van Oosterbosch Declaration. At the time, I believed that the modification was fully negotiated and done, and only ministerial details remained.

15.     On March 1, 2021, as set forth in the Affidavit of Ruth Abady-Soltanovici, Jack confirmed that the amounts in the account statement that I sent with the Modification were correct, but requested that the statement reflect "August and September" interest rather than "September and October" interest. That change matched up with the agreement we had struck, and Ruth's statement was indeed incorrect. However, even after this final confirmation and acceptance of our agreement, rather than execute the modification documents, Plaintiff and Counterclaim Defendants retained the $1 million payment and commenced this lawsuit.

16.     Since commencing this lawsuit, Plaintiff has contacted certain of Defendants' customers, advising them of the alleged default, and directing them to make payment directly to Plaintiff or its counsel rather than to the Capstone Entities. One such letter is annexed as Exhibit 5 to this affidavit (ST_CAP 000712). Plaintiff targeted some of Defendants' most important customers, using the information freely shared with Plaintiff, De Veste and Oosterbosch over the course of our relationship. The majority of these customers have since elected to terminate their business relationship with Defendants.

17.     I would like to point out that the most damaging aspect of this lawsuit has been Plaintiff's accusations leveled against me personally. It is devastating for a fund manager to be accused of "fraudulent misrepresentation", and specifically of inappropriate conduct with respect to collateral. Plaintiff has chosen not to pursue this cause of action on its motion for summary

judgment, for good reason.  The conversion from a limited partnership to a line of credit was not seamless and the documents, while created and reviewed by lawyers, do not entirely reflect the intent of the parties.  In some places they speak of a "first priority lien"; in others, it is clear that collateral is shared.  This is not "fraudulent misrepresentation", but at most a drafting error.  Any investment in CCCLF has always been senior subordinated debt, as clearly stated on the first page of CCCLF's Private Placement Memorandum, already attached as Exhibit 2 to this affidavit.  There was never any intention to elevate any investor to a status superior to others just because they had to make changes to their investment structure to be in compliance with the laws of The Netherlands.

18.     Moreover, as we have indicated repeatedly, including in our original Answer and Counterclaims, filed on June 1, 2021, full disclosure was made to Jack and if questions were raised about any UCC-1, I answered them.  Answer ¶ 19 [ECF 27].  I am attaching as Exhibit 6 an email exchange that took place in December 2018 (CAPSTONE 0002134-0002138).  Until the lawsuit was filed, I had no reason to believe that I had failed to answer any questions to the satisfaction of Jack, De Veste and Stichting.

19.     Not surprisingly, since the lawsuit was filed, since Stichting sent the letters to our customers, and as the pandemic continued, not a single new subscription has been received by CCCLF, and it has remained difficult to raise capital for the activities of the Capstone Entities. Jack says in his Declaration that the Capstone Entities "surprisingly reneged" on terms in a settlement proposal "signed by all parties."  Van Oosterbosch Declaration ¶ 27.  I should point out first that the settlement proposal was not signed by Jack or by De Veste, but I also want to say that there was nothing "surprising" about the Capstone Entities' inability to meet the demands of Stichting.  Plaintiff's short-sighted litigation strategy has made it difficult to fulfill

8

Defendants' intention to pay back every penny of the principal invested.

WHEREFORE, for all the reasons stated herein, I respectfully request that this Court deny the motions.

JOSEPH F. INGRASSIA

Sworn to before me this
31 day of March, 2022

Notary Public

SIDNEY HARRISON
Notary Public-State of Florida
Commission # HH 157656
My Commission Expires
July 25, 2025